In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-08-00004-CV


____________________



IN RE COMMITMENT OF JACK KIRSCH






On Appeal from the 410th District Court 


Montgomery County, Texas


Trial Cause No. 07-05-04726-CV 






MEMORANDUM OPINION


 The State of Texas filed a petition to civilly commit Jack Kirsch as a sexually violent
predator under the Sexually Violent Predator Act (the "Act"). See Tex. Health & Safety
Code Ann. §§ 841.001-.150 (Vernon 2003 & Supp. 2008). A jury found Kirsch suffers from
a behavioral abnormality making him likely to engage in a predatory act of sexual violence. 
Id. § 841.003 (Vernon 2003). The trial court entered a final judgment and order of civil
commitment under the Act. In his sole appellate issue, Kirsch contends that the evidence was
legally insufficient to support the jury's finding that Kirsch suffers from a behavioral
abnormality. 

 To be civilly committed under the Act, the State must prove beyond a reasonable
doubt that a person is a sexually violent predator. Id. § 841.062(a) (Vernon 2003). A
sexually violent predator is a person who (1) "is a repeat sexually violent offender; and (2)
suffers from a behavioral abnormality that makes the person likely to engage in a predatory
act of sexual violence." § 841.003(a)(1), (2). Under the statute, a "behavioral abnormality"
is defined as "a congenital or acquired condition that, by affecting a person's emotional or
volitional capacity, predisposes the person to commit a sexually violent offense, to the extent
that the person becomes a menace to the health and safety of another person." § 841.002(2)
(Vernon Supp. 2008).

 In In re Commitment of Gollihar, we stated that 

 [b]ecause the statute employs a beyond-a-reasonable-doubt-standard, on appeal
we review legal sufficiency issues by the standard of review applied in
criminal cases for legal sufficiency of the evidence. To test the legal
sufficiency of the evidence that supports an affirmative jury finding, we review
all of the evidence in a light most favorable to the verdict. 

 

In re Commitment of Gollihar, 224 S.W.3d 843, 846 (Tex. App.--Beaumont 2007, no pet.)
(citations omitted). In the present case, we review the evidence presented at trial to
determine if a rational jury could have found beyond a reasonable doubt that Kirsch suffers
from a behavioral abnormality making it likely that he will engage in predatory acts of sexual
violence. See id.

 At trial the State presented testimony from Kirsch by his video deposition. Among
other things, Kirsch described the incidents leading to his five prior convictions for sexual
offenses. All were against young boys between the ages of eight and twelve. The State also
presented expert testimony from Dr. Daniel Murrie, a psychologist, and Dr. Lisa Clayton, a
psychiatrist. 

 As part of his assessment, Dr. Murrie reviewed Kirsch's records and met with Kirsch
for three hours. Using the statutory definition of behavioral abnormality, Dr. Murrie opined
that Kirsch has a behavioral abnormality that makes him likely to engage in predatory acts
of sexual violence. Dr. Murrie found Kirsch's juvenile history and early sexual experiences
relevant. Dr. Murrie explained that early delinquency is a risk factor for continued offending. 
Dr. Murrie testified that Kirsch described himself as becoming fixated on boys at an early
age. Kirsch told Dr. Murrie that his sexual interest "always tended to lie" in young boys. Dr.
Murrie further testified that there were "mentions in the records of fantasies particularly
fantasies about children of a sexual nature[,]" and that "[m]any of these were in recent
treatment records in which they had described [Kirsch] as reporting fantasies about boys." 
Dr. Murrie stated that while fantasies alone may or may not relate to reoffending, "the
presence of fantasies, ongoing fantasies, in somebody who has acted on those in the past"
raises concerns regarding recidivism. Dr. Murrie stated that a relationship also exists
between an erratic work history and recidivism. While Kirsch has been incarcerated most
of his adult life, Dr. Murrie found a great deal of instability in Kirsch's work history with
respect to the periods when he was not incarcerated. 

 Concerning Kirsch's first and second sexual convictions, Dr. Murrie testified that the
age of the boys was significant because the boys were prepubescent, which is a diagnostic
criteria for pedophilia. Dr. Murrie found Kirsch's behavior of approaching children for the
purpose of sexual contact significant. Dr. Murrie explained that "this wasn't a long standing
relationship where [Kirsch] sort of had a lapse in judgment. He seemed to meet them as
strangers, entice them back to his place, pretty clearly with a purpose of pursuing sexual
contact with them." 

 With regard to Kirsch's third sexual conviction, Dr. Murrie found significant that
Kirsch again sought out a child whom he did not know, invited the child to take a ride with
him, then took the child to an isolated area and "pursu[ed] sexual contact in a pretty forceful
way." Dr. Murrie stated that Kirsch's use of force with regard to this victim "demonstrates
a strong urge or strong press to do this kind of behavior." Dr. Murrie also explained that the
offense which led to Kirsch's conviction for his third sexual offense occurred while he was
out on bond for his first and second sexual convictions. Dr. Murrie found this significant
because it shows a tendency for Kirsch to commit these acts even when he knows he will
face severe consequences for them. 

 Kirsch's fourth sexual conviction involved a runaway boy Kirsch met at a bus stop. 
The child was with Kirsch in his apartment for roughly seventeen days. Dr. Murrie testified
that this was significant in that it showed a "sustained interest in sexual interest in kids . . .
not a one time fluke or a lapse in judgment, but a sustained, ongoing drive that apparently in
that time wasn't easily satiated . . . ." Regarding the fifth conviction for a sexual offense,
Kirsch befriended the father of the child. Kirsch told the man that he himself had children
who had died and he missed being around children. Dr. Murrie found this significant
"because it shows sort of a plan and, again, more working towards establishing a relationship
to get access to children." Dr. Murrie further testified that besides the offenses of which
Kirsch was convicted, Kirsch stated that he had fifty-six other victims. Dr. Murrie stated that
the number of Kirsch's victims is significant because "it's a much more intense pattern than
just five victims. . . ." 

 Dr. Murrie conducted actuarial testing on Kirsch. Dr. Murrie scored Kirsch on the
Static-99, an actuarial used for estimating a sex offender's risk of recidivism. Kirsch scored
in the highest risk range for reoffense. (1) Dr. Murrie also conducted the psychopathy checklist
on Kirsch. Dr. Murrie explained this is a personality test that gauges how psychopathic
someone is. Kirsch's score, which was in the average range for criminal offenders, showed
some psychopathic characteristics. Dr. Murrie stated it is "pretty rare" for pedophiles to
score high on the psychopathy test. Dr. Murrie further explained that he did not base his
opinion solely on actuarials because a thorough assessment also requires looking at
individual factors that may be unique from case to case. 

 Dr. Murrie diagnosed Kirsch with pedophilia and anti-social personality disorder. He
relied on the DSM in making these diagnoses and then explained to the jury that the DSM
is a uniform set of diagnostic criteria for disorders provided by the American Psychiatric
Association and is standard for this type of assessment. Dr. Murrie explained to the jury in
detail what led to his diagnoses of pedophilia and anti-social personality disorder. Dr. Murrie
testified that because Kirsch meets the diagnostic criteria for pedophilia, that would be
considered a behavioral abnormality under the statute, and based on other information in the
records, Kirsch appears to be at a high risk of reoffending, relative to other offenders. 

 Dr. Clayton met with Kirsch for two-and-one-half hours and also reviewed the
records from Kirsch's file. Like Dr. Murrie, Dr. Clayton testified that in her medical opinion
Kirsch has a behavioral abnormality that makes him likely to engage in predatory acts of
sexual violence. In speaking with Kirsch about his juvenile history, Dr. Clayton found that
Kirsch had been sexually assaulted at approximately eight or nine years of age, and that
Kirsch admitted to a very sexualized childhood. 

 Kirsch was sent to military school as a young boy. Dr. Clayton stated that while
Kirsch was in military school, he engaged in sexual activity with other boys his age. As
Kirsch grew older, he continued to engage in sexual activity with the younger boys at the
military school. Kirsch related to Dr. Clayton that at this point he realized he had become
fixated on young boys between the ages of eight and twelve. He further told Dr. Clayton that
he was eventually kicked out of military school and sent to an academy in Florida where he
continued to engage in sexual activity with younger boys. Dr. Clayton believed that Kirsch's
early experiences showed the development of a behavioral abnormality. 

 Dr. Clayton found Kirsch's lack of long-term relationships significant because it
showed that Kirsch "ha[dn't] been able to really attach with any adult successfully." Kirsch
told Dr. Clayton that as a child he had developed torture fantasties. Dr. Clayton found the
torture fantasies relevant because they revealed the level of Kirsch's sexual deviancy. Dr.
Clayton noted that she reviewed some of the notes from Kirsch's current sex offender
treatment program ("SOTP"), and "there again the issue of torture and fantasizing about
hurting and victims was brought up." 

 Dr. Clayton also discussed Kirsch's prior sexual convictions with him. One of Dr.
Clayton's primary concerns was that Kirsch had many victims prior to his first two sexual
offense convictions. Dr. Clayton testified that the number of Kirsch's victims shows the
severity of his urges of pedophilia. Dr. Clayton testified that when Kirsch committed the
offense that led to his third conviction, he had only been out on bond for about a month. 
Additionally, Dr. Clayton believed Kirsch's use of force with his third victim showed
escalating sexual deviancy and violence. 

 With respect to Kirsch's fourth conviction, Dr. Clayton stated the length of time
Kirsch kept the boy showed a higher degree of violence and sexual depravity. It was also
significant to Dr. Clayton that at the time Kirsch committed the fourth sexual offense, he had
already been in prison for three prior sexual offenses. Likewise, with respect to Kirsch's
fifth sexual offense, Dr. Clayton found it relevant that Kirsch had already received a life
sentence for molesting his fourth victim and served eleven years in prison before being
paroled. Kirsch was out of prison on parole at the time he committed the offense that led to
his fifth conviction. According to Dr. Clayton, this shows that "[Kirsch] couldn't control or
reform his behavior even when he was out on parole and if he violated, [would have to] go
back for life." In Dr. Clayton's opinion, Kirsch "could not resist the urge" to molest the
young boy. 

 Dr. Clayton testified that she had reviewed Dr. Murrie's report and agreed with his
opinions. Dr. Clayton noted that Kirsch had the benefit of several months of SOTP
programming but believed that he was still not taking full responsibility for his sexually
deviant behavior and that he was not being honest. Dr. Clayton diagnosed Kirsch with 

"pedophilia, exclusive male," and anti-social personality disorder. Dr. Clayton explained to
the jury the basis for her diagnoses of pedophilia and anti-social personality disorder. Dr.
Clayton testified that in diagnosing Kirsch she used the DSM, which is typically relied upon
in the psychiatric field. 

Legally Sufficiency of the Expert Testimony


 As part of his legal sufficiency complaint, Kirsch argues that the expert testimony
presented by the State failed to indicate any basis for the experts' conclusions that Kirsch has
a behavioral abnormality that makes him likely to reoffend. Kirsch asserts that the lack of
a basis renders such evidence incompetent and insufficient to support the judgment. He
argues that the testimony presented by the State's experts "consists of nothing but bare
conclusions," and that "neither expert was able to describe the alleged behavioral
abnormality, the cause of the alleged abnormality, or provide the court with any professional
analysis to predict the probability that Kirsch would go out and engage in what the statute
describes as sexually violent actions." In support of his argument, Kirsch cites Coastal
Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227 (Tex. 2004), and contends that
the expert testimony submitted by the State "may be described as conclusory or
speculative[,]" and that "an objection is not needed to preserve a no-evidence challenge to
conclusory expert testimony." Id. at 232. 

 We have considered a similar argument in conjunction with our review of other civil
commitment judgments and found, under circumstances similar to those here, that error was
not preserved. See In re Commitment of Barbee, 192 S.W.3d 835, 842-43 (Tex. App.--Beaumont 2006, no pet.); see also In re Commitment of Sanchez, No. 09-06-244 CV, 2007
WL 1443403, at *2 (Tex. App.--Beaumont May 17, 2007, no pet.) (mem. op.); In re
Commitment of Corder, No. 09-06-020 CV, 2006 WL 3742805, at *3 (Tex. App.--Beaumont
Dec. 21, 2006, no pet.) (mem. op.); In re Commitment of Rhynes, No. 09-05-496 CV, 2006
WL 3627007, at **1-2 (Tex. App.--Beaumont, Dec. 14, 2006, no pet.) (mem. op.); In re
Commitment of Hall, No. 09-05-482 CV, 2006 WL 1682194, *5 (Tex. App.--Beaumont June
15, 2006, no pet.) (mem. op.). 

 In In re Commitment of Barbee, appellant argued that this court should disregard the
expert witness testimony that Barbee suffered from a behavioral abnormality and that he "did
not need to object to conclusory or speculative testimony because it amounts to no evidence,
or factually insufficient evidence, to support the jury's verdict." 192 S.W.3d at 842. The
appellant in Barbee also cited Coastal Transport in support of his argument. Id. We
explained as follows:

 In Coastal, the Texas Supreme Court reviewed the reliability of a trucking-safety expert who testified that a defendant's conduct involved a high degree
of risk; that the defendant had an actual awareness of the risk; and that the
defendant nevertheless proceeded with conscious indifference to the safety of
others. The Court held that no objection is necessary to preserve error when
the evidence in the record demonstrates that the expert's opinion is not
probative on its face.


 Even though the Coastal Court did not require an objection to preserve
error in view of the expert's testimony and the record, the Court specifically
stated that when the challenge to the reliability of the expert requires the court
to examine the expert's underlying methodology, technique, or foundational
data, a timely objection is required "so that the trial court has the opportunity
to conduct this analysis." Thus, when the complaint concerns the foundational
data used or relied upon by the expert, a party must present a timely objection
to the trial court to preserve any complaint for appeal.


Id. at 842-843 (citations omitted). 


 The record here shows that both Dr. Murrie and Dr. Clayton were licensed in their
respective fields, both interviewed Kirsch, and both reviewed Kirsch's records. Both Dr.
Murrie and Dr. Clayton explained to the jury that the instruments and constructs used were
those typically relied upon by professionals in their fields. Both experts based their opinions
on the facts and data gathered from the records, their interviews with Kirsch, and the tests
conducted. Both experts explained in detail what facts and evidence they took into account
in formulating their opinions, how those facts were relevant, and how those facts influenced
their opinions. Both experts then opined that Kirsch has a behavioral abnormality under the
statute. 

 Kirsch complains on appeal that the testimony of Dr. Murrie and Dr. Clayton "consists
of nothing but bare conclusions[,]" and that the experts failed "to indicate any basis for the
so-called expert conclusions that Kirsch has a behavioral abnormality that makes him likely
to reoffend . . . ." Kirsch focuses on the events and evidence relied upon by Dr. Murrie and
Dr. Clayton in their assessments and argues that such data could not be used to properly
predict the risk of Kirsch reoffending or assess whether he has a behavioral abnormality. (2) 
As set forth above, the Court in Coastal found no objection to the expert testimony was
necessary when the evidence in the record demonstrates the expert's opinion is not probative
on its face. Coastal Transport, 136 S.W.3d at 233. Kirsch has failed to show that the
evidence of which he complains is not probative on its face. See In re Commitment of
Barbee, 192 S.W.3d at 843 (citing Coastal Transport, 136 S.W.3d at 233). Moreover, the
substance of Kirsch's complaint concerns the foundational data relied upon by Dr. Murrie
and Dr. Clayton. 

 "The trial court acts as a gatekeeper to screen out unreliable expert evidence." In re
Commitment of Martinez, No. 09-05-493 CV, 2006 WL 2439752, at *1 (Tex. App.--Beaumont Aug. 24, 2006, no pet.). To preserve a complaint that expert testimony is
unreliable and constitutes no evidence, a party must object before trial or when the evidence
is offered. Id. Kirsh did not object to the reliability of the expert testimony at trial. Because
he did not object at trial to the testimony of Dr. Murrie or Dr. Clayton, he waived review of
his complaint that such evidence was unreliable. 

Undefined terms


 As part of his legal sufficiency argument, Kirsch also notes that two terms set forth
in the Texas civil commitment statute, "likely" and "beyond a reasonable doubt" are not
defined by either the statute or "jurisprudence." The testimony of Dr. Murrie and Dr.
Clayton is not insufficient merely because the term "likely" is not defined by the statute or
case law. See generally Teer v. State, 923 S.W.2d 11, 19 (Tex. Crim. App. 1996) ("When
words are not specifically defined by the Legislature, they are to be understood as ordinary
usage allows, and jurors may freely read the statutory language to have any meaning which
is acceptable in common speech."); see also Tex. Gov't Code Ann. § 311.011(a) (Vernon
2005) ("Words and phrases shall be read in context and construed according to the rules of
grammar and common usage."). In reviewing the sufficiency of the evidence to support a
jury verdict, we simply construe undefined words by "opening them to the broadest possible
understanding in the context of which they are reasonably susceptible in ordinary English." 
Teer, 923 S.W.2d at 19. 

 Likewise, the fact that the term "beyond a reasonable doubt" is not defined by the
statute or case law does not render the expert testimony legally insufficient to support the
judgment. Although this is a civil case, as noted in appellant's brief, the Court of Criminal
Appeals has overruled prior precedent requiring that the jury in a criminal case be instructed
on the definition of "beyond a reasonable doubt" holding that "the better practice is to give
no definition of reasonable doubt at all to the jury." Paulson v. State, 28 S.W.3d 570, 573
(Tex. Crim. App. 2000) (footnote omitted). The Court in Paulson noted that if both parties
were to agree on a submitted definition, "it would not constitute reversible error for the trial
court to acquiesce to their agreement." Id. There is nothing in the record here to indicate
that either party submitted a requested instruction on the definition of "beyond a reasonable
doubt." Kirsch argues that the jury had no definitions of the terms "likely" and "beyond a
reasonable doubt." Kirsch was free to submit any requested instructions to the Court but
failed to do so. See Tex. R. Civ. P. 273, 278. 

 Finally, Kirsch complains on appeal that in opining that Kirsch has a behavioral
abnormality making him likely to reoffend, Dr. Clayton did not define "likely," other than
to say it is "more than just a mere possibility." Just as the absence of a definition of such
term does not render the expert testimony insufficient to support the judgment, Dr. Clayton's
explanation of the term "likely" does not, in and of itself, render the evidence legally
insufficient to support the jury's finding that Kirsch suffers from a behavioral abnormality. 
 See In re Commitment of Hannah, No. 09-06-314 CV, 2007 WL 2002995, at *3 (Tex. App.--Beaumont July 12, 2007, pet. denied) (mem. op.) (defining "likely" as "probable" or "beyond
a mere possibility" did not render evidence of behavioral abnormality insufficient where
record contained fact witness testimony, expert witness testimony, and exhibits from which
reasonable jurors could conclude Hannah suffered from a behavioral abnormality that makes
him likely to engage in a predatory act of sexual violence). Dr. Clayton's definition of the
term merely goes to the weight that a jury might choose to give her testimony. See generally
In re Commitment of Gollihar, 224 S.W.3d at 851. 

 Viewing the evidence in the light most favorable to the judgment, we hold the jury
could have found beyond a reasonable doubt that Kirsch suffers from a behavioral
abnormality that makes him likely to engage in a predatory act of sexual violence. We
overrule Kirsch's sole issue on appeal and affirm the judgment of the trial court.

 AFFIRMED. 


 __________________________________

 CHARLES KREGER

 Justice

Submitted on May 14, 2009

Opinion Delivered July 16, 2009


Before Gaultney, Kreger, and Horton, JJ.
1. Individuals in the highest risk range had a thirty-nine percent chance of reoffending
over a five-year period and a fifty-two percent chance of reoffending over a fifteen-year
period. 
2. Specifically, Kirsch argues that with respect to the accounts of his sexual experiences
from ages 11 and 12, "Murrie did not explain how events which occurred 40 or more years
before to someone ages 10 to 15 years old is relevant to predict future behavior" of Kirsch
who is now 55 years old. Kirsch further argues that the record is "totally [de]void of any
testimony as to how the details of occurrences of 20-35 years ago" can be used to predict his
behavior in 2008. Kirsch complains that "the factual bases for Murrie's conclusion that
Kirsch is a high risk to reoffend . . . are actuarial tables . . . which cannot be applied to Kirsch
personally, and events which occurred 20-40 years ago." With respect to Dr. Clayton's
testimony, Kirsch likewise complains that she considered the details of his prior offenses
which occurred in 1970, 1975, and 1986. Kirsch complains that Dr. Clayton found his
childhood and juvenile experiences related to sex to be the beginning of a behavioral
abnormality, but did not describe the behavioral abnormality, did not offer a professional
opinion as to whether it was congenital or acquired, and was unable to define the term
"likely," which Kirsch acknowledges is not defined in the statute.